And we'll move now to the final argument on the calendar for today. That is In Re. Windstream Holdings. The first appellant's counsel is Mr. Rukavina. Am I pronouncing that right? So are you, Your Honor. Good morning. Thank you. Okay, good morning. We can see and hear you all right. And Mr. Rhodes for appellee? Yes, Your Honor. Okay, and I can see and hear you as well. So you've got 10 minutes each, but Mr. Rukavina, you have reserved two minutes for rebuttal. So that gives you eight now. You may proceed. Thank you, Your Honor, and may it please the court. I'm a bankruptcy lawyer primarily in Texas, so I may not be as polished before this court as it's used to having a... Polished? No, you'll be more polished. You'll just be slower. But I do understand the subject matter that we're going to discuss. I teach bankruptcy. I live bankruptcy. I love bankruptcy. And I do think I have some purpose and some conviction here in what I'm saying. And overall, what I'm saying is that this court and appellate courts very rarely have the opportunity to see what happens early in a large bankruptcy case. Because very rarely are there objections and very rarely are there appeals. And as a consequence, over the last 30 years, every big case that's filed... So everybody else, everyone other than Mr. Rukavina, if you could just unmute yourself. Thank you. Not the panel. Thank you. So with every new case, the envelope is pushed a little bit more and a little bit more, and it has to stop. In this case, 263 chosen preferred so-called critical vendor creditors of equal priority with my client, an unsecured creditor, they were paid $80 million in cash early in this case, $100. My client, like more than a billion dollars of unsecured creditors, at the end of the case were paid $0. Zero. As a result of what the Bankruptcy Court did early on through so-called first day pleadings, $185 million in debt was paid up front. The first problem that I have, Your Honor, is what is the standard for critical vendor treatment? I'm not suggesting that there shouldn't be critical vendor treatment, but there has to be a standard. It goes back to what's called a doctrine of necessity. And while the Sovereign District of New York has, for almost 30 years, filed published opinions, the court here went way outside of, I humbly submit, any recognized standard of the doctrine of necessity. The doctrine requires necessity, as it says, and it requires perhaps not irreparable injury to the bankruptcy debtor, but it requires a very serious consequence. The doctrine does not exist for convenience. And as the record below is clear, the debtor, Winstring, wanted to use the prospect of paying some of its vendors in full to negotiate better deals. That may be wise from a business perspective, but that's not the doctrine of necessity. And, Your Honor, the quality of treatment under the Bankruptcy Code amongst similarly situated creditors is a key fundamental principle. So the first request that I have of this court is that the court set forth, here are the elements or here are the factors that are going to govern which chosen creditors are going to be paid in full. Can I ask a question, Counselor? My understanding here is that your client did not render any post-bankruptcy filing services. Is that correct? That is correct. And that the others did. They were ongoing service providers. Is that accurate? Your Honor, I cannot answer that question fully because that's part of my argument. We don't know who the other service providers were. But in theory, yes. In theory, only those creditors that agreed to provide post-bankruptcy services would have received the critical vendor payments. Right. And your client didn't do that. So at least, I don't know what standard you have in mind, but wouldn't that be a factor in setting any kind of rule? And isn't that, in effect, what the district judge did here, or the bankruptcy judge? Well, I think I agree with the first question. Yes, the provision of post-bankruptcy services in exchange for the payment absolutely should be a requirement, whether it's an element or a factor. Otherwise, why is the debtor paying them? So your complaint is not that you were excluded. Your complaint is that too many people were included. My complaint is not that I was excluded. We're not here arguing whether I qualified or didn't qualify for critical vendor status. Right. My complaint is that as an unsecured creditor, in this case, I was paid zero dollars, while 263 creditors who were of the same priority were paid in full. That is a discriminatory treatment. And it is one where, again, 185- It is discriminatory, in that sense, the way you've argued it. But such discrimination would be permitted, under your own reasoning, if they had all rendered post-petition services. Your Honor, such discrimination is permissible under the Doctrine of Necessity. But it is not just the rendering of post-petition services that's important. The debtor needs to prove that it can't get those services elsewhere. So in some courts, in applying this doctrine, they say that basically the vendor has to be a sole source vendor. That the debtor has no meaningful alternative. I'm not suggesting that we go quite that far. But the debtor must make an evidentiary demonstration that not paying this critical vendor is going to lead to some level of serious disruption to the bankruptcy estate as a whole. Mr. Rukavina, I mean, you or your client didn't, you know, basically seek a stay at the bankruptcy court's initial order regarding these pre-petition debts, right? We did not. And you didn't seek an exit out of appeal? We did not. And you didn't ask the bankruptcy court to hold off on the reorganization plan until it was appealed, right? That's correct. So I guess given that there's now a reorganization plan, given now that we are way downstream, why isn't this a case where we ought to be exercising our discretion with respect to equitable estoppel? Do you mean estoppel or mootness? Mootness. Your Honor, equitable mootness under the bankruptcy code applies only to certain orders. The confirmation order, which this is not. A sale order, which this is not. And a post-petition financing order, which this is not. So the court would be making new law, I respectfully suggest, if the court would now apply equitable mootness to any order. And this is not equitably moot. I'm not trying to upset the reorganization. I'm trying to say that there should be a particularized finding on remand. The question isn't so much whether you're trying to. The question is whether it will, in effect, do just that. Judge Sack, respectfully, I disagree. I think the question is, is the court able to fashion a remedy? That's a future equitable question that can be addressed upon remand. We don't know who these vendors were. But if one of them is a blue chip, multi-billion dollar company, in its order to disgorge $5 million, that's a potential remedy. So the fundamental question is, is relief upon remand possible? If it is possible, although it might be inconvenient, then it is not equitably moot, and it is not traditionally moot. And why, if all these payments went out to these creditors, and you never objected at the time, in the sense of trying to delay it and litigate this particular point, and it went through, why aren't all their debts, all their payments, at risk? And therefore, the whole bankruptcy, the foundation of the bankruptcy of the plan is threatened. Judge Walker, there's two different issues. The plan has been confirmed. I did not object to the plan. The plan is final and binding. The debtor exited bankruptcy some time ago, and it's out there, hopefully, making money. If the debtor will argue in the future and present evidence that this gorging one of these payments is going to lead to some kind of irreparable or catastrophic consequences, then that's part of what the bankruptcy judge will take into account as it considers equitable disgorgement. But again, if it's a vendor that's no longer even a vendor, if it can easily disgorge the funds, and if those funds can come back to be equitably distributed amongst other creditors that receive zero, then respectfully, it is not a question of mootness. It would have been impossible for me, my little client in Dallas, Texas, to post a stay pending appeal bond of $185 million. That's why we didn't do that. Your Honor, I see that I'm out of time. I would like to address the confidentiality and other issues I've raised, but I'll have to rest on my briefs on that. Thank you. All right. Well, you've got some time for rebuttal, so maybe we'll be able to get to that then. Mr. Rhodes, you've got 10 minutes, so you may proceed. May it please the Court. Harker Rhodes for Apelli Windstream Holdings. As both the Bankruptcy Court and the District Court recognized here, GLM's arguments are both legally baseless and practically untenable. The approach to critical vendor relief that GLM asks this Court to adopt would dramatically upend bankruptcy court practice and would make it practically impossible for debtors, especially in large and complex bankruptcies, to make payments that are essential to preserving their value as a going concern for the benefit of all creditors. But this Court need not even reach the merits of GLM's arguments because GLM's appeal is both constitutionally and equitably moot. It is constitutionally moot because no matter how this Court decides this appeal, GLM cannot possibly attain any additional recovery. GLM's claim in this bankruptcy, which is its only potential right to payment here, was discharged by the Bankruptcy Court's confirmation order. That claim no longer exists. No matter what happens in this appeal, GLM has no further claim, and GLM made no attempt to appeal from that confirmation order or to seek a stay of that confirmation order in order to avoid mootness. The appeal is also equitably moot because, as some of this Court's questions suggested, the relief that GLM seeks attempts to cast doubt on more than $100 million in payments that Windstream has already made under the terms of the critical vendor order and were the foundation of the now confirmed and substantially consummated plan. Again, Windstream made no attempt to stay the critical vendor order pending those payments or to expedite its appeal so that this Court would have an attempt to resolve the legality of the critical vendor order before those payments were made and before Windstream and its vendors relied on them. Even if this Court were to address the merits of GLM's appeal, it should affirm for the reasons given by the Bankruptcy Court and by the District Court. First, the Bankruptcy Court did not impermissibly delegate its judicial function to Windstream here. Instead, the Bankruptcy Court reviewed the evidence that Windstream presented and found it sufficient to carry Windstream's burden to show that the critical vendor relief that Windstream requested was, in fact, appropriate and in the best interests of creditors as a whole. That is exercising the judicial function. It is not delegating it. Countless other Bankruptcy Courts have used exactly the same procedure in ruling on critical vendor motions, as the District Court and the Bankruptcy Court both recognized, and no case has ever found that procedure to be an impermissible delegation of the judicial function. Second, nothing in the Bankruptcy Court or in any other legal authority requires Windstream to publicly disclose its confidential commercial information, including the identities of its critical vendors, especially when doing so could potentially trigger a run on the Bank that would deplete the estate and harm all creditors. Third, the Bankruptcy Court correctly found that the evidence Windstream presented was sufficient to carry its burden for its critical vendor relief. As both the Bankruptcy Court and the District Court recognized, the evidence showed that the protocol that Windstream used here, which again relied on the same factors that Bankruptcy Courts have considered in numerous cases, would address all of the relevant issues in determining whether particular vendors were, in fact, critical, and that payments would only be made if vendors that were, in fact, critical demanded payment in order to continue providing essential services such that those payments would, in fact, be in the best interest of all the creditors as a whole. For those reasons, the Court should dismiss the appeal or affirm. So I have a question on this. Coming up with the list of 263, this list was generated by a client, correct? Your Honor, it was initially generated by the client, and that list was then verified by my client's financial— outside financial advisers who went through the process that was laid out in the testimony before the Bankruptcy Court of determining whether each of the individual vendors out of the 15,000 vendors that Windstream had did, in fact, meet the necessary criteria to be critical for Windstream's business. Right, and was there a norm that was used to determine criticality, or is it just sort of a, you know, it's sort of a subjective conclusion that was reached? Well, no, Your Honor. I think the standard that was applied to determine the criticality of the vendor is laid out both in the critical vendor motion itself that our clients filed to explain why they needed this relief, and that's at A14, I believe, A13 to 14 of the appendix, in which we set out precisely what the reasons were and what the factors were that we looked at to determine whether a particular vendor was critical. And then it's also set out again in the testimony that was presented to the District Court, which doesn't reiterate all of those 10 factors, but which explains what this investigation was. And at the end of the day, the investigation that was carried out here is exactly the investigation that GLN says should be carried out. Namely, the evidence before the court showed that the procedure here determined whether paying any particular vendor was in the best interest of all creditors because it would maximize the total value of this estate by preserving WinStream as a going concern. And so the process looks, for example, to whether a particular vendor's services could be obtained from an alternative source, whether the vendor was in fact necessary, whether the services that the vendor provided were in fact necessary for WinStream to continue as a going operation. And the Bankruptcy Court in the end in its critical vendor order found that the evidence presented was in fact sufficient to show that paying these vendors was necessary to preserve WinStream's going concern value. I'm happy also to talk in a little more detail about the mootness issue because I know that that wasn't addressed necessarily in as much depth in our briefs. And I want to make sure that that's something that the court fully understands because it is a threshold jurisdictional question. The only right to payment that GLM has ever asserted in this case was its claim in the bankruptcy proceeding. That claim has been fully discharged by the Bankruptcy Court's confirmation order. There is no longer any claim that GLM has to any payment in this proceeding. And so because the Bankruptcy Court's confirmation discharges that claim, there's no potential for GLM to recover any further payment from this bankruptcy. And GLM raises two responses to that in its reply brief. First, GLM suggests that there could conceivably be some avoidance action on remand that could be brought to claw back some of these critical vendor payments if in fact the critical vendor order were reversed. But the problem with that argument is that under the plan, any such avoidance action would belong to the reorganized debtors, not to GLM. And so if there were to be any recovery of any sort of clawback here, that money would only go to the reorganized debtors themselves. There's no mechanism under which it could conceivably flow to GLM itself. And so GLM simply no longer has a financial interest here. And of course, that simply leads into the equitable mootness argument as well, which is even if there were some way for this money to be recovered for GLM, that would require upsetting and casting doubt on potentially well over $100 million in payment that WinStream made to its critical vendors while the critical vendor order was in place and that were the foundation of GLM's now confirmed and substantially consummated plan. I want to ask you a question about Article III mootness first. Yes, Your Honor. So if Mr. Arrufovina were to prevail, so we send this back, and so that enables there to be a clawback of proceeds from the 273 pre-petition debtors who got this money, isn't there a potential this is going to increase the value of the estate and could lead to the bankruptcy court blowing up the reorganization plan? Is that not possible? Your Honor, our understanding, and to be clear, this is not a situation that has occurred in the past, and so there isn't clear judicial precedent on how this would apply. But I think the only conceivable way that these payments could be clawed back would be through some sort of an avoidance action, such as GLM suggests in its reply brief under 549A, for example. If that were to occur, that avoidance action could only be brought by the reorganized debtors themselves. There's no longer any bankruptcy estate. We now have the reorganized debtors. There's this big pot of new money. And then, so you're saying the bankruptcy court is going to have nothing to do with that? Well, Your Honor, the bankruptcy court would have to adjudicate any kind of avoidance action, but that avoidance action would just be brought by the reorganized debtors for the benefit of the reorganized debtors. None of the other creditors could possibly have a claim against that money because those claims were all discharged by the final bankruptcy court confirmation order. Right, so they're discharged on the basis of the understanding that the money was sort of legitimately allotted. If that now is upended, wouldn't it open at least the door, a crack, to an argument that, well, the old plan is not up to the task. We've got to start over. Your Honor, our position would be that because the confirmation order remains in force and GLM hasn't challenged the confirmation order, that order would independently bar any further disbursement to GLM because that order discharges GLM's claim. Now, but to be clear, Your Honor, if the court were to disagree with me on this Article III mootness question, if the court were to find that there's at least some theoretical possibility that these payments could be clawed back, that would only underscore the equitable mootness problem here, which is that the relief that GLM requests would effectively blow up the confirmed and consummated plan because it would require clawing back payments from potentially over $100 million in payments that were made to critical vendors and that were the foundation of the plan itself. I'm happy to answer any further questions that the court may have, either on mootness or on the merits, but if not, we would ask the court to either dismiss the appeal or affirm. All right, no further questions. Thank you, Mr. Rhodes. Mr. Rucavina, you've got two minutes for rebuttal. Thank you, Your Honor. The question is not one of discharge. All that a discharge says is that I cannot enforce my claim against the post-confirmation reorganized debtor. My claim still exists. It can be enforced against anyone and anything else, just not against the reorganized debtor. So the fact that there's a discharge does not matter to the mootness issue. The fact that I have a claim that's been allowed in the bankruptcy is all that matters. If money comes in for whatever reason into the bankruptcy estate, there is some method available for it to be redistributed to unsecured creditors. Also, Your Honor, it's not a question about blowing up the plan as Your Honor suggested. I agree completely with Mr. Rhodes that the plan is its own separate creature. It's final, it's binding. It cannot be upset. Again, the economics of the plan might change, but that's a separate issue. We're not risking the conclusion of this bankruptcy case if some creditors upon a remand are found not to have qualified as critical vendors. What I'm asking for shouldn't be controversial on principle. I'm asking for transparency, which this court has written about repeatedly. I'm asking for equality of treatment and that if there's going to be disparate treatment, there be serious reason for it. And I'm asking for my judge to make that determination a fact, not to delegate it to a debtor, to do it really in secrecy in its discretion. It's cold comfort for the judge to say, okay, debtor, here are these 10 factors. You go now and you in secrecy decide in your discretion which creditor qualifies under these 10 factors. That is- Was there no submission to the trustee, the U.S. trustee of that information? There was the United States. Well, that's not true, your honor. The United States trustee- That was a question. The United States trustee was given the list after the fact. So the United States does know who was paid, but the United States trustee did not- Were they not given it on a regular basis? The bankruptcy court ordered so, and I'm assuming that the debtor complied. Your honor, my time is up. I thank your court for your time today. Mr. Rugovino, let me just ask one further question. Wouldn't it be a lot easier, I mean, accepting the legitimacy of all the points you just made about transparency and knowing what's going on, wouldn't it be easier and more efficient to do that before reorganization? The various means available to stay in action, to get an expedited appeal, to get review. I would respectfully submit, your honor, that even if I had unlimited resources to do that, it would have been impossible to get expedited review before these payments would have been made. And in bankruptcy, to ask an innocent creditor to have to bond around $185 million, it's not practical. That's why I began my presentation by saying that what happens early in a bankruptcy case sometimes wires the end, and the appellate courts almost never are able to look at it. Yet billions and billions and billions of dollars in countless cases go out the door on the front end, and it keeps evading appellate review. I urge the court, to the extent it has discretion, to look into the merits of this. And even if the court publishes an opinion pursuant to its advisory, or I'm sorry, its administrative powers, that talks about critical vendor status, it can dismiss my case, but still give guidance and binding precedent to lower courts on how they should be administering this with thousands of innocent creditors and billions of dollars involved in a daily basis. Thank you, Your Honor. Okay, thank you both. We will reserve decision. That concludes our arguments for today. We have one other case on submission. In a minute, I'll ask the clerk to adjourn court. Before I do that, let me thank Ms. Rodriguez, our deputy. I also want to thank our tech folks. Today went off without a hitch. That's the norm. And it's not, it just doesn't automatically happen. We've got great support. So that's a good thing. It was nice to see you all. I hope we can see you again in the courtroom sometime soon. In the meantime, stay safe. Ms. Rodriguez, you can adjourn court. I think you're on mute. Of course, thanks adjourn.